**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION (CLEVELAND)**

| | |
|---|---|
| RAY GILE, derivatively on behalf of VIEWRAY, INC., | Case No.   1:20-cv-01615 |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| SCOTT W. DRAKE, CALEY CASTELEIN, JAMES F. DEMPSEY, SCOTT HUENNEKENS, D. KEITH GROSSMAN, DANIEL MOORE, BRIAN K. ROBERTS, GAIL WILENSKY, KEVIN XIE, ADITYA PURI, HENRY A. MCKINNELL, JR., AJAY BANSAL, CHRIS A. RAANES, SHAHRIAR MATIN, DAVID BONITA, BRIAN KNALEY, AND THEODORE T. WANG, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| VIEWRAY, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

Ray Gile ("Plaintiff"), by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant ViewRay, Inc. ("ViewRay" or the "Company") against certain former and current members of its Board of Directors (the "Board") and executive officers (defined herein as the "Individual Defendants") for violations of the federal securities laws, including Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, waste of corporate assets, and unjust enrichment for misconduct taking place starting on May 10, 2018 through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (i) review and analysis of public filings made by ViewRay and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by ViewRay, the Individual Defendants, and other related non-parties; (iii) review of news articles, stockholder communications, and postings on ViewRay's website concerning the Company's public statements; (iv) pleadings, papers, and any documents filed with and publicly available in the related securities fraud class action captioned *Plymouth County Retirement Assoc. v. ViewRay, Inc., et al.*, Case No. 1:19-cv-02115-JG (S.D. Ohio) (the "Securities Action"); and (v) review of other publicly available information concerning ViewRay and the Individual Defendants.

## I.    NATURE OF THE ACTION[1]

1.      ViewRay's principal product is the ViewRay MRIdian® ("MRIdian system"), which, according to the Individual Defendants, is an innovative system that integrates high quality radiation therapy with simultaneous magnetic resonance imaging ("MRI") technology.

---

[1] All emphasis is added unless stated otherwise.

2.     Aside from revenue and income, ViewRay measures its financial performance using the Company's backlog (the "Backlog"), which is the accumulation of all orders for which revenue has not been recognized but which ViewRay considers valid.  According to the Company's filings with the SEC, ViewRay includes a transaction in its Backlog when there is an outstanding and effective written agreement for the delivery of a MRIdian system signed by a customer with a minimum customer deposit or a letter of credit requirement.

3.     During the Relevant Period, while ViewRay repeatedly posted poor revenues and sustained losses, the Individual Defendants consistently pointed to the Company's Backlog as the purported true indication of ViewRay's financial performance, which increased rapidly just before, and remained significantly elevated throughout, the Relevant Period.  However, unknown to investors, the Individual Defendants were fraudulently manipulating ViewRay's Backlog and artificially inflating it.

4.     The Individual Defendants were able to artificially inflate ViewRay's Backlog due to the different sales channels the Company used outside of North America.  Specifically, North America accounted for one-third of ViewRay's Backlog and sales, and the remaining two-thirds of its Backlog and sales were derived from the Company's international market.  In North America, ViewRay has a direct sales force, which sells the MRIdian system directly to the end-user customer with no third-party interaction, whereas in the international market, ViewRay uses third-party distributors, who may or may not be supported by ViewRay employees, and who interact directly with the end-user customer, including installing the MRIdian system for the end-user customer.  Thus, in the international market, because ViewRay does not make sales directly to the end-user customer, the Individual Defendants would include orders in the Backlog that were not contracted

for with any actual end-user customer, thereby inflating the value of the Backlog with invalid transactions.

5.     Throughout the Relevant Period, the Individual Defendants would point the market to the Company's massive Backlog as an indication that increased sales and revenue generation would come to fruition in about eighteen months.  However, given that the Backlog in fact contained invalid transactions that did not have an actual contract with a customer, these sales were never realized, which was shown by ViewRay's low conversion rate—*i.e.*, the Company's revenue recognition was substantially lower than the amount of new orders and "value" of the Backlog.

6.     On August 8, 2019, the Individual Defendants were forced to partially reveal the fraud, as ViewRay announced that it would miss its guidance due, in part, to international distributors not fulfilling their orders.  Upon this news, the price of ViewRay's common stock plummeted by approximately 54%, or $3.64 per share, to close at $3.10 per share on August 9, 2019, on unusually high trading volume.

7.     It was not until January 13, 2020, however, that the Individual Defendants were forced to come completely clean.  In a press release issued that day (the "January 13, 2020 Press Release"), ViewRay announced its disappointing results for the fourth quarter of 2019, which reported substantially decreased new orders added to the Backlog and the Company's continued failure to convert ViewRay's Backlog into actual sales and revenue.

8.     The market reacted swiftly, as the price of ViewRay's common stock dropped over 24%, or $0.895 per share, to close at $2.855 per share on January 13, 2020.

9.     Despite the Company's shareholders losing millions as a result of the Individual Defendants' fraudulent scheme, not all investors fared so poorly.  Indeed, Defendant Dempsey profited substantially when he dumped hundreds of thousands of personally-held ViewRay shares

while in possession of nonpublic material information, including that ViewRay's Backlog was artificially inflated and that the Company could not convert it into revenue, for ill-gained proceeds of **$1,377,038.30** between July 1, 2019 and September 3, 2019.

10.     During the Relevant Period, the Individual Defendants made several materially false and misleading statements and omissions, including, *inter alia*: (i) that the Company's reported Backlog was overstated due to the inclusion of orders with insufficient surety as to permit their inclusion in the reported Backlog; (ii) the Company included invalid orders in the Backlog, which were not valid transactions by ViewRay's own stated criteria and did not have a contract with an end-user customer; (iii) the Company's internal controls were not, in fact, effective; and (iv) as a result of the foregoing, ViewRay's public statements were materially false and misleading at all relevant times.

11.     As a result, the Individual Defendants have, among other things, violated the federal securities laws, breached, and continue to breach, their fiduciary duties and violate the law by: (i) causing ViewRay to issue materially false and misleading reports with the SEC and other public statements, which contained falsified and inflated Backlog metrics, among other things; and (ii) failing to implement meaningful internal controls over ViewRay's financial reporting process.

12.     Once the dust settled, the Individual Defendants' misconduct caused ViewRay to become a named defendant, along with the Company's Chief Executive Office ("CEO"), Scott Drake ("Drake"); Ajay Bansal ("Bansal"), the Company's former Chief Financial Officer ("CFO"); James F. Dempsey ("Dempsey"), ViewRay's founder and Chief Scientific Officer ("CSO"); Chris A. Raanes ("Raanes"), ViewRay's former President and CEO, and a member of the ViewRay Board from February 4, 2013 through July 22, 2018; and Shahriar Matin ("Matin"),

ViewRay's Chief Operating Officer ("COO") (collectively, the "Securities Defendants") in the Securities Action.

13.     Because of the Individual Defendants' misconduct, as detailed herein, the Company has been severely damaged, including, but not limited to: (i) losing $573,383,171.97 in market capitalization; (ii) costs incurred related to the improper and excessive pay to the Individual Defendants of $53,482,360.00; (iii) allowing Defendant Dempsey to reap ill-gained proceeds of $1,377,038.30 from insider sales made while in possession of material nonpublic information; and (iv) potentially hundreds of millions in liability and legal expenses incurred as a result of defending and resolving the Securities Action.

14.     ViewRay's Board has not, and will not, commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to ViewRay for authorizing or failing to correct the improper statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred.  Accordingly, a pre-suit demand upon the Board is a useless and futile act, and as a result, Plaintiff rightfully brings this action to vindicate ViewRay's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to the Company.

## II.     JURISDICTION AND VENUE

15.     The Court has jurisdiction over all claims under 28 U.S.C. § 1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in Ohio, or is an individual who has sufficient minimum contacts with Ohio so as to render the exercise of jurisdiction by the courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District.

18.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

### III.     THE PARTIES

19.     Plaintiff Gile is a current shareholder of ViewRay and has continuously owned ViewRay stock since 2017.  Plaintiff will hold ViewRay stock continuously throughout the pendency of this action.  Plaintiff brings this action derivatively in the right of and for the benefit of the Company.  Plaintiff will fairly and adequately represent the interests of ViewRay and its shareholders in enforcing the rights of the Company.

20.     Nominal defendant ViewRay is a Delaware corporation with its principal executive offices located at 2 Thermo Fisher Way, Oakwood Village, Ohio, 44146.  According to its public filings, ViewRay designs, manufactures, and markets MRIdian, an MR Image-Guided radiation therapy system to simultaneously image and treat cancer patients.

21.     Defendant Drake is ViewRay's President and CEO and has been a director since July 2018.  Defendant Drake is a named defendant in the Securities Action.  During the Relevant

Period, Defendant Drake paid himself $27,923,608 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2019 | $700,000 | $2,794,832 | $1,525,000 | $420,000 | $113,400 | $5,553,232 |
| 2018 | $308,681 | $11,157,300 | $10,751,674 | - | $152,721 | $22,370,376 |
| | | | | | TOTAL COMP | $27,923,608 |

22.     Defendant Bansal served as ViewRay's CFO from June 8, 2016 to September 30, 2019, when he abruptly resigned.  Defendant Bansal is also a named defendant in the Securities Action.  During the Relevant Period, Defendant Bansal pocketed $1,617,337 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2019 | $260,800 | $175,000 | $175,000 | - | $98,069 | $708,869 |
| 2018 | $342,537 | - | $455,426 | $102,255 | $8,250 | $908,468 |
| | | | | | TOTAL COMP | $1,617,337 |

23.     Defendant Dempsey is ViewRay's founder, CSO, and was director from January 2008 until April 13, 2020.  Defendant Dempsey is also a named defendant in the Securities Action.  During the Relevant Period, while in possession of nonpublic material information, Defendant Dempsey sold hundreds of thousands of shares of his personal Company stock for proceeds of $1,377,038.30, and Defendant Dempsey paid himself $2,592,099 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2019 | $340,587 | $902,300 | $325,000 | $102,176 | $25,544 | $1,695,607 |
| 2018 | $327,200 | - | $455,460 | $113,832 | - | $896,492 |
| | | | | | TOTAL COMP | $2,592,099 |

24. Defendant Matin has served as ViewRay's COO since June 2016. Defendant Matin is also a named defendant in the Securities Action. During the Relevant Period, ViewRay was forced to pay Matin $15,277,238 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|---------------|----------------------------------------|------------------------|-------|
| 2019 | $425,000 | $2,500,000 | $762,500 | $191,250 | $54,957 | $3,983,707 |
| 2018 | $187,413 | $5,578,650 | $5,375,837 | - | $151,631 | $11,293,531 |
| | | | | | TOTAL COMP | $15,277,238 |

25. Defendant Raanes was ViewRay's former CEO, President, and director, from February 4, 2013 through July 22, 2018. Defendant Raanes is also a named defendant in the Securities Action. During the Relevant Period, Defendant Raanes paid himself $2,509,038 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $262,877 | - | $1,860,708 | $155,944 | $229,509 | $2,509,038 |
| | | | | | TOTAL COMP | $2,509,038 |

26. Defendant David Bonita, M.D. ("Bonita") was a director from January 2008 until February 2018. During the Relevant Period, Defendant Bonita paid himself $26,745 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2018 | $26,745 | - | $26,745 |
| | | TOTAL COMP | $26,745 |

27. Defendant Keith Grossman ("Grossman") is a ViewRay director and has been since July 2018. Defendant Grossman is also a member of ViewRay's Audit Committee and has been since at least July 2018. During the Relevant Period, Defendant Grossman paid himself $409,430

in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Fiscal Year | Fees Paid in Cash | Stock Award | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $55,000 | $115,000 | - | $170,000 |
| 2018 | $19,194 | 220,236 | - | $239,430 |
| | | | TOTAL COMP | $409,430 |

28.     Defendant Theodore T. Wang ("Wang") was a ViewRay director from January 2017 until July 15, 2019. During the Relevant Period, Defendant Wang paid himself $112,175 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Fiscal Year | Fees Paid in Cash | Stock Award | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $18,750 | - | - | $18,750 |
| 2018 | $40,000 | $53,425 | - | $93,425 |
| | | | TOTAL COMP | $112,175 |

29.     Defendant Daniel Moore ("Moore") is a ViewRay director and has been since February 2018.  Currently, Defendant Moore is a member of the Audit Committee.  During the Relevant Period, Defendant Moore paid himself $544,137in cash, incentive-based compensation, and other awards not justified by Moore's actual performance:

| Fiscal Year | Fees Paid in Cash | Stock Award | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $90,000 | $115,00 | - | $205,000 |
| 2018 | $71,778 | $267,359 | - | $339,137 |
| | | | TOTAL COMP | $544,137 |

30.     Defendant Caley Castelein, M.D. ("Castelein") is a ViewRay director and has been since January 2008.  Currently, Defendant Castelein is a member of the Compensation Committee and the chair of the Nominating and Corporate Governance Committee.  During the Relevant

Period, Defendant Castelein paid himself $291,425 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Fiscal Year | Fees Paid in Cash | Stock Award | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $62,000 | $115,000 | - | $177,000 |
| 2018 | $61,000 | $53,425 | - | $114,425 |
| | | | TOTAL COMP | $291,425 |

31.     Defendant Brain K. Roberts ("Roberts") is a ViewRay director and has been since December 2015.  Currently, Defendant Roberts is the chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  During the Relevant Period, Defendant Roberts paid himself $305,925 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Fiscal Year | Fees Paid in Cash | Stock Award | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $75,000 | $115,000 | - | $190,000 |
| 2018 | $62,500 | $53,425 | - | $115,925 |
| | | | TOTAL COMP | $305,925 |

32.     Defendant Scott Huennekens ("Huennekens") is a ViewRay director and has been since February 2018.  Defendant Huennekens is the chair of the Compensation Committee.  During the Relevant Period, Defendant Huennekens paid himself $486,303 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Fiscal Year | Fees Paid in Cash | Stock Award | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $60,000 | $115,000 | | $175,000 |
| 2018 | $43,944 | $267,359 | - | $311,303 |
| | | | TOTAL COMP | $486,303 |

33.     Defendant Henry A. McKinnell, Jr. ("McKinnell") was a ViewRay director from April 2016 until June 2019.  While a director, McKinnell served on the Nominating and Corporate Governance Committee.   During the Relevant Period, Defendant McKinnell paid himself

$125,842 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2019 | $29,917 | - | $29,917 |
| 2018 | $42,500 | $53,425 | $95,925 |
| | | TOTAL COMP | $125,842 |

34.     Defendant Aditya Puri ("Puri") was a ViewRay director from February 2015 until June 2019.  While a director, Defendant Puri served on the Audit Committee and the Compensation Committee.  During the Relevant Period, Defendant Puri paid himself $136,258 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance.

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2019 | $25,833 | - | $25,833 |
| 2018 | $57,000 | $53,425 | $110,425 |
| | | TOTAL COMP | $136,258 |

35.     Defendant Kevin Xie ("Xie") is a ViewRay director and has been since October 2019.  During the Relevant Period, Defendant Xie paid himself $215,000 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance.

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $11,250 | $203,750 | $215,000 |
| | | TOTAL COMP | $215,000 |

36.     Defendant Gail Wilensky ("Wilensky") is a ViewRay director and has been since July 2019.  During the Relevant Period, Defendant Wilensky paid herself $255,000 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance.

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $22,500 | $232,500 | $255,000 |
| | | TOTAL COMP | $255,000 |

37.     Defendant Brian Knaley ("Knaley") has been ViewRay's interim CFO since October 2019.  During the Relevant Period, Defendant Knaley paid himself $812,300 in cash, incentive-based compensation, and other awards not justified by ViewRay's actual performance.

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2019 | $281,000 | $251,000 | $194,240 | $64,498 | $20,787 | $812,300 |
| | | | | | TOTAL COMP | $812,300 |

38.     Collectively, Defendants referred to in paragraphs 21 through 37 are referred to herein as the "Individual Defendants."

39.     Collectively, Defendants referred to in paragraphs 26–27, 29, 31, and 34 are referred to herein as the "Audit Committee Defendants."

40.     As mentioned above, Defendants referred to in paragraphs 21–25 are referred to herein as the Securities Defendants.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

41.     According to the Company's most recent Annual Report filed on Form 10-K with the SEC, ViewRay is a medical device manufacturer incorporated in Delaware and maintains its principal place of business in Ohio.  On July 23, 2015, ViewRay went public, listing the Company's common stock to the NASDAQ under the ticker symbol "VRAY."

42.     ViewRay specializes in the development of MRI-guided radiation therapy ("MRgRT") technology for the treatment of cancer, and in 2012, ViewRay's sole product, the MRIdian system, became the first MRgRT system on the market following FDA approval of its Cobalt-60 powered device, and subsequently, the FDA approved the next-gen MRIdian Linac, which used more advanced linear accelerator, or "linac"-based radiation beams.  Moreover, in

addition to receiving approval from the FDA, the upgraded MRIdian was also approved for use by the European Union, Taiwan, Canada, and Israel.

43.     ViewRay generates almost all of its revenue from the sale of the MRIdian system. For example, in fiscal years 2018 and 2017, MRIdian system sales represented 94.6% and 89.5% of ViewRay's total revenue, respectively.

44.     Typically, it takes nine to as much as eighteen months for a ViewRay customer to prepare its facility to receive a new MRIdian system after the purchase contract is executed (referred to as "vault readiness").  Installation then takes an additional sixty to ninety days. ViewRay purportedly does not recognize revenue on any of its North America contracts until the system is installed, whereas in the case of international orders, ViewRay recognizes revenue when the MRIdian system is delivered.

45.     In July 2018, ViewRay underwent significant churning in management, and specifically, Defendant Drake replaced Defendant Raanes as the President and CEO, and Defendant Matin was made COO, replacing Douglas H. Keare, who had served in the position since April 2015.  Furthermore, Defendants Drake and Grossman were added to the Board, and in announcing Defendants Matin's and Drake's arrivals at the Company, the Board stated that both had "deep operational experience with fast-growing medical companies [that would] be invaluable" to ViewRay.  However, rather than proving to be "invaluable," given their misconduct alleged herein, Defendants Drake and Matin would become the most expensive additions to ViewRay in the Company's history, costing it hundreds of millions of dollars.

46.     One of Defendant Drake's first orders of business was to create a new "vault readiness" team to purportedly help customers speed up the process between contract signing and revenue recognition.   Because the average time from contract to revenue recognition had

historically been at least a year, and more often upwards of eighteen months, Drake and his new management team had substantial visibility into installation delays, and thus the timing of recognition of revenue and related costs, related to the orders in Backlog.  In fact, the Individual Defendants regularly stated that revenue was "baked" about one year before it was recognized.

**B.**     **ViewRay Operated at a Loss Throughout the Relevant Period**

47.     Since it went public and throughout the Relevant Period, ViewRay has consistently failed to generate positive revenues.

48.     Specifically, for the fiscal years 2018 and 2019, even though its costs were rising, ViewRay's revenues remained effectively flat.  Consequently, ViewRay was low on cash and operated at a loss since 2017.  Thus, ViewRay was forced to frequently hold public offerings in order to cover the Company's costs.

49.     With the Company under water, and facing flooding costs, the Individual Defendants devised a scheme to artificially inflate the Company's Backlog by booking transactions that were not valid and should not have been included in ViewRay's Backlog, which falsely assured investors that profits would follow, as these orders converted to revenue.

**C.**     **Materially False and Misleading Statements**

50.     Starting at least as early as May 10, 2018, ViewRay was forced to issue a press release announcing its first quarter of 2018 ("1Q18") results, which was filed with the SEC as part of a Form 8-K signed by Defendant Raanes.  The press release stated that ViewRay's revenue for the quarter was $26.2 million, and its net loss was $7.5 million.  Specifically, the press release reported that "*[t]otal [B]acklog grew year over year to $195.0 million, as of March 31, 2018, up from $144.9 million as of March 31, 2017*."

51.     Also, on the same day, ViewRay was forced to hold an earnings call with analysts, where Defendant Raanes touted ViewRay's Backlog, orders, and ability to convert the Backlog into revenue.  Defendant Raanes portrayed the Company as if ViewRay was on the brink of success, stating, "***We're scaling up our ability to secure new orders and install more systems simultaneously***."  Defendant Raanes went on to state, in relevant part:

> ***On the install process, we're making solid progress on that. The install times continue to come down, and we see ourselves on track to be in the 30- to 40-day range by the end of the year. So we're feeling real good about that. We continue to maintain the teams, such the 3 internal installs, 2 externals, and actually, we're done training the third group out. So we should be able to do 3 internal and 3 external.***

52.     Moreover, also on May 10, 2018, the Individual Defendants forced ViewRay to file its quarterly report for the 1Q18 on Form 10-Q (the "1Q18 Form 10-Q"), which was signed by Defendants Raanes and Bansal, and, among other things, falsely stated that:

> ***We perform a quarterly review of [B]acklog to verify that outstanding orders in [B]acklog remain valid, and based upon this review, orders that are no longer expected to result in revenue are removed from [B]acklog. Among other criteria we use to determine whether a transaction to be in [B]acklog, we must possess both an outstanding and effective written agreement for the delivery of a MRIdian signed by a customer with a minimum customer deposit or a letter of credit requirement, except when the sale is to a customer where a deposit is not deemed necessary or customary (i.e. sale to a government entity, a large hospital, group of hospitals or cancer care group that has sufficient credit, sales via tender awards, or indirect channel sales that have signed contracts with end-customers). We decide whether to remove an order from our [B]acklog by evaluating the following criteria: changes in customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; changes to regulatory requirements; the status of regulatory approval required in the customer's jurisdiction, if any; and other reasons for potential cancellation of order contracts.***
>
> ***During the three months ended March 31, 2018, we received new orders for MRIdian systems, totaling $21.2 million, and based on our [B]acklog review, we removed one order from our [B]acklog. At March 31, 2018, we had total [B]acklog of $195.0 million.***

53.     Then, on August 3, 2018, ViewRay was made to issue a press release announcing its financial results for the second quarter of 2018.  The press release announced that ViewRay's revenue for the quarter was $16.4 million, and its net loss was $22.0 million.  Moreover, the press releases also reported that "*[t]otal [B]acklog grew year-over-year to approximately $200 million as of June 30, 2018, up from approximately $182 million as of June 30, 2017*."

54.     Later that day, ViewRay was forced to hold an earnings call with investors, and on the call, Defendant Bansal, again, made false and misleading statements related to ViewRay's Backlog and ability to generate a profit.  In particular, in response to an analyst's question related to ViewRay's minor reduction in the Backlog, Defendant Bansal falsely claimed that "*because of some of the aging and some of the nonprogress on a couple of accounts, we took them out of our [B]acklog*."  Furthermore, Defendant Bansal claimed that "a large portion of our [B]acklog is fairly current" and "fairly sticky," stating:

> *[S]o if you look at the orders we took in '16 and the orders we took in '17, we have announced we took 13 orders in '16 and we took 19 orders in '17. So that adds up to 32. So most of our [B]acklog, a large portion of our [B]acklog is fairly current. There are some units in the [B]acklog which are older aged and that primarily has to do with some customers having ordered Cobalt systems earlier and now converting them to the linacs, and with respect to the cancellation rate, as I mentioned, before, we took 2 units out of [B]acklog in our cancellations, we have just taken them out of [B]acklog because with a couple of distributors we did not see enough movement on those couple of projects. Overall, in the last year or 2, we've had, I believe, 2 cancellations or 3 cancellations in total. So it's a fairly sticky backlog. As we have shared with you, these institutions have to make a very conscious decision to switch from something they've been doing for 30 years with the cone beam CT linac to go for an MRI linac and pay the kind of money that our product is worth. So they make these decisions with a lot of thought, and that leads to the stickiness of the [B]acklog*

55.     Then, on August 7, 2018, the Company was forced to file its quarterly report on Form 10-Q (the "2Q18 Form 10-Q") for the second quarter of 2018, which was signed by Defendants Drake and Bansal, and also reiterated the false and misleading statements related to

the Company's Backlog, including that "[*a]t June 30, 2018, [ViewRay] had total [B]acklog of $199.7 million*."

56.     Following the conclusion of the third quarter of 2018, on November 8, 2018, the Individual Defendants caused ViewRay to publish a press release announcing its results for the quarter, and in connection with the press release, the Company was also forced to hold an earnings call with analysts.  On the call, in response to a question from an analyst concerning ViewRay removing orders from the Company's Backlog, Defendant Drake stated, "*[i]t became more of an aging issue from our criteria standpoint.  We still have the orders.  I mentioned that on the call, you may have missed that, earlier.  But the orders are still in hand.  But it's gotten to a point from an aging standpoint that we think it's prudent to take them out.*"  Furthermore, Defendant Bansal added that "*[a]t the end of the quarter, our [B]acklog stood at approximately $201 million*."

57.     On the next day, the Company was made to file its quarterly report for the third quarter of 2018 on Form 10-Q (the "3Q18 Form 10-Q"), which was signed by Defendants Drake and Bansal, and also reiterated the false and misleading statements related to the Company's Backlog, including that "*[a]t September 30, 2018, [ViewRay] had total [B]acklog of $200.9 million*."

58.     At the conclusion of the 2018 fiscal year, on January 7, 2019, the Company was forced to issue a press release that announced ViewRay's preliminary financial results for the fourth quarter of 2018 and the fiscal year 2018 ("FY18") that stated, among other things, "*[d]uring the quarter our [B]acklog grew to $212 million, and we removed three systems.  While we will continue to review the [B]acklog each quarter, our recent thorough review is now complete*."

59.     The next day, on January 9, 2019, Defendant Drake spoke at the JPMorgan Global

Healthcare Conference with analysts, and during the conference, Defendant Drake discussed

ViewRay's Backlog, stating, "*[w]e have scrubbed what I'm calling the legacy [B]acklog of the

company*."  Then, in response to an analyst's question related to the timing between when an order

is placed and when the order is converted to revenue, Defendant Drake stated:

> *Generally speaking, if we had 8 orders placed in Q4 of '18 roughly, right, think of the fact that we have to have capacity to do 8 installations in Q4 of '19. Roughly -- targeting getting to a 12-month process.* So that's kind of roughly, right, how I would think about it. That capacity is being built by [Defendant Matin] and his team. We are for the first time actively engaging in the vault readiness process with program managers and engineers. Prior to this, we were very passive about that process. And now, we're driving it forward. So I think – the reason I've said to The Street that *the most import metric to me in 2019 is orders is because that's what we can impact. The installations is really a consequence of those orders that were placed, in our case, about 18 months ago.*
>
> *           *           *
>
> *So the question is do we have confidence that we'll be able to install what's forthcoming in 2019 and recognize revenue. The short answer to that is yes.* [Chief Commercial Officer] Jim [Alecxih] and I are working as hard as we can to make the – problem in the company, [Defendant Matin] is to solve, by driving orders up, to make it a challenge for our ops team to really have to get going even further and faster. We've built a team and we're building a team that will have the capability to do what we need to do operationally. I'm confident of that.

60.     A few months later, on March 14, 2019, ViewRay was forced to issue a press

release announcing its 2018 fourth quarter and FY18 results.  The press release reported that for

FY18, ViewRay recorded total revenues of $81 million on the sale of 13 systems and 2 system

upgrades, compared to the Company's fiscal year 2017 revenues of just $34 million on the sale of

just 6 systems.  ViewRay was also forced to publicly state that during FY18 it had received 23

new orders for MRIdian system totaling $140.7 million, up from 19 new orders totaling $113.6

million in FY17, and that its total Backlog increased to $212.3 million as of December 31, 2018,

up from $203.6 million as of December 31, 2017.

61.     Later that afternoon, the Individual Defendants forced ViewRay to hold a conference call with analysts to discuss the foregoing financial results, and on the call, Defendant Drake stated, in pertinent part:

[O]n the operational front, we're making significant progress. The majority of our vault readiness team is in place, and we are actively engaging with every customer to prepare for installation and shorten the overall time frame from purchase order to revenue recognition and first patient treated. ***We are experiencing shorter PO to rev rec time frames and expect continued progress.***

\*       \*       \*

***We are smoothing and speeding the path from PO to first patient treated. . . .*** [and] ***[f]rom a revenue perspective, as you know, revenue is largely baked a year in advance given the lead times in the business.***

62.     Moreover, in responding to an analyst's question regarding revenue, Defendant Drake stated:

Well, we want to be very thoughtful about the guidance that we set[.] . . . We're obviously early in the year. We think we've put it in the right place. Midpoint of that range, as I mentioned, is about 45% growth over prior year. And we feel good about that on an expanding base of business. So if we got to the point where we felt like a change were warranted, we would certainly make The Street aware of that, but we think we've set it in an appropriate place. ***I would tell you, from a revenue perspective, I feel really good about our capability and expanding capability of turning purchase orders into revenue recognition. I think the team is doing very thoughtful work. Our goal is to get those right and solid versus doing them as quickly as we can. That is a change from how the company was being operated previously. So I am in no rush to try to drive revenue falsely north in any way by hurrying an installation.*** I am much more interested in delivering customer delight. We believe fervently in the opportunity that lies ahead and the size of that opportunity, and the value proposition that we bring to that opportunity yields a certain amount of patience that we have to get things right and to do them very solid going forward.

63.     Then, in response to an analyst's question regarding ViewRay's capabilities to install the orders in its Backlog, Defendant Drake explained:

Yes, I think that's right. I mean, my goal is to get to the point where we're installing systems at the speed that our customers desire. ***And I would say that, historically, kind of us not proactively engaging from a vault readiness standpoint was***

*probably the biggest reason for that average of 18 months from PO to rev rec versus where we're heading, which we think is roughly 12 months.*

64.     Furthermore, Defendant Drake assured the market that the Company's Backlog represented a true and accurate picture of ViewRay's order by stating, "[i]n the fourth quarter of 2018, we removed 3 systems from our backlog. While we'll continue to review the Backlog each quarter, our recent thorough review is now complete."

65.     Likewise, with respect to ViewRay's Backlog, Defendant Bansal commented:

Let me now turn to orders and [B]acklog. In the fourth quarter of 2018, we received 8 new orders from MRIdian Systems totaling approximately $49 million compared to 6 orders totaling $34 million for the same period last year. For the full year 2018, we received 23 new orders, totaling approximately $141 million, up from 19 new orders, totaling $114 million in 2017.

At year-end 2018, our [B]acklog stood at approximately $212 million compared to $204 million at year-end 2017. In the fourth quarter of 2018, we removed 3 systems from our backlog. ***While we'll continue to review the [B]acklog each quarter, our recent thorough review is now complete***.

66.     Then, on March 15, 2019, the Individual Defendants caused ViewRay to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Form 10- K") with the SEC, which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Defendants Drake, Bansal, Moore, Castelein, Dempsey, Grossman, Puri, McKinnell, Roberts, Wang, and Huennekens.  In particular, the 2018 Form 10-K stated that "[b]ased on our assessment, we removed $53.5 million and $11.1 million from the [B]acklog for fiscal year 2018 and 2017 respectively; none were removed for fiscal year 2016. At December 31, 2018, we had a [B]acklog with a total value of $212.3 million."

67.     Furthermore, the 2018 10-K stated that:

*We evaluate our [B]acklog at least quarterly to determine if the orders continue to meet our criteria for inclusion in [B]acklog. We may adjust our reported [B]acklog to account for any changes in: customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability*

- 20 -

*to fulfill the order contract; regulatory requirements; the status of regulatory approval required in the customer's jurisdiction (or other factors); or due to changes in our judgment about the likelihood of completing an order contract.*

68.    In addition, the 10-K further falsely represented the following regarding the effectiveness of the Company's internal controls:

Under the supervision and with the participation of our management, including our [CEO] and [CFO], we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2018 based on the framework established in "Internal Control – Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Our management concluded that our internal control over financial reporting was effective as of that date.*

69.    Then, on May 2, 2019, after the close of trading, ViewRay was forced to issue a press release announcing its first quarter 2019 ("1Q19") results for the interim period ended March 31, 2019.  The release quoted Defendant Drake stating that the 1Q19 results were "*a solid start to the year and reflect progress on [the Company's] commercial, innovation, and clinical pipelines*," emphasizing that ViewRay was "*well-positioned to execute in 2019*."  As to guidance, the release stated that ViewRay was "*reiterating its financial guidance for the full year 2019*," confirming the Company still "*anticipate[d] 2019 total revenue to be in the range of $111 million to $124 million, and total cash usage to be in the range of $65–$75 million*."

70.    Later that day, the Individuals forced ViewRay to hold an earnings call with analysts, and on the call, Defendant Drake continued to make false claims related to the Company's financial prospects in light of its Backlog, stating:

*[T]he installations that we're working on are more or less baked about a year ahead of time. So we're still executing on what I would call kind of the legacy pipeline that the new management team inherited and I feel like that work is being done in an outstanding way by the team, we have capabilities to do more installations in parallel now than we did previously, and the work is being done in a very systematic fashion*, and I think we'll continue to make steady improvements throughout 2019.

We are seeing a little more high level, [ ] as you're aware, than what the previous team shared in terms of installation timeframes. ***But I would tell you that we have made very steady progress on a quarterly even monthly basis and that will continue throughout 2019 and probably in to early 2020, when we'll get to the stated goal that the company has which is, generally speaking, 80% or so of our orders will be able to translate into revenue in a 12-month period of time versus 18 months previously***.

71.     On this same call, Defendant Bansal also spoke about the Backlog, stating, "***[a]s of March 31, 2019 our [B]acklog stood at approximately $238 million compared to approximately $212 million at year-end 2018***."

72.     The next day, ViewRay filed its quarterly report for the first quarter of 2019 on form 10-Q (the "1Q19 10-Q"), which was signed and certified pursuant to SOX by Defendants Drake and Bansal.  In the 1Q19 10-Q, regarding the calculation of ViewRay's Backlog, the 1Q19 10-Q stated that ViewRay "perform[ed] a quarterly review of [B]acklog to verify that outstanding orders in [B]acklog remain[ed] valid, and based upon this review, orders that [were] no longer expected to result in revenue [were] removed from [B]acklog," adding that:

> We decide[d] whether to remove or add back an order from or to [its] [B]acklog by evaluating the following criteria: changes in customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; changes to regulatory requirements; the status of regulatory approval required in the customer's jurisdiction, if any; the length of time the order has been on our backlog; and other reasons for potential cancellation of order contracts.

Moreover, the 1Q19 10-Q also reported that "***[a]t March 31, 2019, we had total [B]acklog of $237.5 million.***"

73.     A few months later, on July 15, 2019, Defendant Wang abruptly resigned from the Board, and the next day, the Board appointed Defendant Wilensky to replace Defendant Wang.

**D.**     **The Company's Materially False and Misleading Proxy Statement**

74.     On April 25, 2019, the Individual Defendants caused ViewRay to issue a proxy statement for the Company's 2019 annual meeting of stockholders pursuant to Section 14(a) of the Exchange Act (the "Proxy Statement").  With respect to the misleading statements in the Proxy Statement, Plaintiff's allegations are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  In fact, Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claim.

75.     In the Proxy Statement, the Individual Defendants, except for Defendants Xie and Wilensky, solicited shareholder votes for the re-election of Defendants Grossman and Drake. However, the Proxy Statement contained materially misleading statements with respect to this vote, and consequently, the Company's shareholders' votes were based on materially inaccurate information. For example, the Proxy Statement explained the Audit Committee "reviews our critical accounting policies and estimates" and that the Audit Committee's purpose was "to oversee our financial reporting processes on behalf of ViewRay's [Board]."

76.     Moreover, the Proxy Statement also touted the Board's role in the "Risk Oversight Process," stating:

> Risk assessment and oversight are an integral part of our governance and management processes. Our [Board] encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the board of directors at regular board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.

Our [Board] does not have a standing risk management committee, but rather administers this oversight function directly through our [Board] as a whole, as well as through various standing committees of our [Board] that address risks inherent in their respective areas of oversight. In particular, our [Board] is responsible for monitoring and assessing strategic risk exposure, and our audit committee is responsible for overseeing our major financial risk exposures and the steps our management has taken to monitor and control these exposures. The [A]udit [C]ommittee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related party transactions. Our [N]ominating and[C]orporate [G]overnance [C]ommittee monitors the effectiveness of our corporate governance guidelines. Our [C]ompensation [C]ommittee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

77.     However, these statements above were materially false and misleading because, as detailed herein, the Audit Committee did not oversee the financial reporting process or review critical accounting policies and estimates, exemplified by the fact that ViewRay recognized invalid transactions in the Company's Backlog, which artificially inflated the Company's value to investors.  Likewise, for the same reason, the Board did not exercise any material risk oversight, including the Company's risk of violating the law or its own policies.  Additionally, the Board did not exercise any risk oversight when it allowed several of the Company's fiduciaries to make improper statements about the Company's business and financials in various public filings and press releases concerning these subjects.

78.     The misleading statements in the Proxy Statement were the essential link to the directors' reelection.

**E.     The Truth Emerges**

79.     The Individual Defendants' scheme began to unravel through a series of partial disclosures beginning on August 8, 2019, when after the close of trading, ViewRay was forced to issue a press release announcing its second quarter of 2019 ("2Q19") results and updating its fiscal year 2019 ("FY19") guidance.  Specifically, for the 2Q19, ViewRay reported a net loss of $30.8

million, or $0.32 per share.  The press release also disclosed only three new orders in the quarter, totaling $18.1 million, the lowest since 1Q17.  Furthermore, according to the press release, ViewRay revised its FY19 revenue guidance to between $80 million and $95 million (12–15 systems), well below the $111 million to $124 million (17–19 systems) guidance it had provided on March 14, 2019 and later maintained on May 2, 2019.  Moreover, the press release also disclosed that total cash use for FY19 was now expected to be in the range of $80 million to $90 million, up considerably from the prior guidance range of $65 million to $75 million.  To add insult to injury, the Individual Defendants also disclosed that the employment of CFO Bansal would end effective September 30, 2019.  The foregoing results increased ViewRay's losses and delayed the Individual Defendants' claimed path to profitability.

80.     The press release also disclosed that while the Backlog had decreased, its value was still artificially inflated at $219.3 million.

81.     Also, on August 8, 2019, ViewRay was made to hold an earnings call with analysts. On the call, Defendant Drake explained that the lower guidance was a result of a foreign distributor not being able to fulfill orders.  In particular, Defendant Drake stated that "***We have removed 2 other systems due to a distributor potentially not fulfilling their commitment this year***."  Rather than disclosing the truth about the extent of the issue concerning foreign distributors' failure to fulfill orders, Defendant Drake represented that "[t]here's end customer demand at both the clinical and executive level of these 2 hospitals.  We will ensure that we have the right strategic partner to, not only fulfill these 2 orders, but to address growing demand in this market.  We are working to resolve this issue, but are not sure we'll be able to do so by year-end."

82.     Additionally, on the call, the Individual Defendants continued to mislead the market about the Company's Backlog.  Specifically, the Individual Defendants falsely claimed that the

failure to convert the Backlog into revenue was due to timing issues and that the orders would eventually be filled, given the demand exhibited by end-users.  With respect to the Backlog, Defendant Drake had the following exchange with an analyst on the call:

> Anthony Charles Petrone Jefferies LLC, Research Division – Equity Analyst
>
> I think there's clearly 3 moving parts here, there's orders, [B]acklog, installations. I think though from a higher level standpoint is, if we look over the past 90 days, clearly this is nearly a 180 and basically all of those kind of indicators for the business. So maybe just kind of looking at the past 90 days, it seems like a confluence of headwinds hit the business. So maybe just a little bit more on the totality of the change? And then maybe I'll have a couple of individual follow-ups.
>
> [Defendant] Drake ViewRay, Inc. – President, CEO & Director
>
> Yes. Anthony, I would say that in the last 90 days, a few things, number one, I think the pipeline of commercial activity, which the Street doesn't have visibility to has improved, the number of customers that we're calling on is higher. The number of multi-system deals is higher, our ability to, in a few instances, speed customers through the purchasing decision historically 18 to 24 months, we've been able to achieve that more quickly. So I feel better about the overall pipeline than I did previously.
>
> *       *       *
>
> [A]nd the final [thing that's a big difference today versus 90 days ago] would be a distributor that is gone through a management change is doing some portfolio management work and we're probably going to have to find a new distribution partner in that market and don't know whether or not we're going to be able to do that quickly enough to satisfy the end-customer demand here in calendar '19. So the 5 systems where revenue is coming down by is not ultimately, whether or not they will be MRIdian Systems in our estimation, it's more of the timing of that and it's quite possible that those systems will push into 2020 versus taking place in this year and that obviously has an impact on cash consumption.

83.     As an example of the Individual Defendants' concealment of the true financial condition of ViewRay, analysts were surprised and apprehensive concerning the Company's financial results.  For example, an analyst at Guggenheim Securities, LLC stated, in part:

> [N]ew orders had been steadily ramping, you've got probably by some of the volatility, given that the low number of systems that are involved, ***but I think the expectation was the changes that you've put in place since you came on board***

- 26 -

*would certainly cause a positive inflection there. So this number is going to strike people as surprising and a bit concerning*.

84.     Then, on November 12, 2019, ViewRay was forced to issue a press release announcing its third quarter for 2019 ("3Q19") results.  The release reported that the Company's total revenue for the quarter was $20.9 million, generated primarily by three revenue units, and its net loss was $20.8 million, or $0.21 per share.  The press release also claimed that "*[t]otal [B]acklog grew to $230.7 million as of September 30, 2019, compared to $200.9 million as of September 30, 2018*" and "eight new orders for MRIdian system, including three upgrades, totaling approximately $35 million."

85.     The same day ViewRay was forced to hold an earnings call, where Defendant Drake spoke about the Company's inability to convert its Backlog into bookable revenue, stating in part:

> *So to bring down the backlog, it's really in line with what I shared in my prepared remarks. When planning and permitting goes at a good pace, we can move very, very swiftly. And when that's not the case, we are just moving at our customers' pace. So we're trying to make it very clear that we have built the capability set to move quickly, and we will do so when our customers are prepared for that. And when they're not, we don't believe having friction with them, trying to drive it falsely to our time frame is beneficial for long-term relationships. So we're trying to be really clear on one hand that we're well equipped to do it relatively quickly. And on the other hand, we're moving at our customers' pace where we think that's appropriate.*

86.     Then, Defendant Drake went on to articulate the purported manner in which orders are removed from the Backlog, stating in pertinent part:

> *[R]egarding the system that came out of the [B]acklog, our criteria there is both time-based and activity-based for our assessment on the backlog. So if we just don't like either the time frame or the level of activity happening with that customer, that's when we will take them out of backlog. And that's what happened in this particular instance. To be clear, we still have an order from the customer. And our hope is to make them a MRIdian account. But we're just not satisfied on our criteria, and so they came out this time.*

87.     Also, on November 12, 2019, ViewRay was forced to file its quarterly report for the 3Q19 on Form 10-Q ("the 3Q19 10-Q"), which was signed and certified pursuant to SOX by Defendant Drake.  Like the quarterly reports before it, the 3Q19 10-Q reported the artificially elevated Backlog, stating "*[a]t September 30, 2019, we had total [B]acklog of $230.7 million*."

88.     Finally, on January 13, 2020, as the Company's Backlog had now failed for over a year to convert to revenue, and analysts persistently pushed the Individual Defendants for answers, the Individual Defendants were forced to face the music.  On this date, ViewRay issued a press release that reported the Company's preliminary financial results for the fourth quarter of 2019 ("4Q19") and the fiscal year of 2019 ("FY19").  The Company reported that it had generated product revenue of less than $17 million on three units, including one upgrade, which was not consistent with the Individual Defendants' claim that there was an 18-month cycle from order to revenue recognition.  Furthermore, the Individual Defendants, via the press release, announced that ViewRay had received only four new orders for MRIdian system, which also highlighted the Company's problem of converting orders into revenue.  To make matters worse, ViewRay was forced to announce in the press release that after only fourteen months in his position, the Company's Chief Commercial Officer Jim Alecxih was resigning.

## V.     INSIDER SELLING

89.     During the Relevant Period, while the Company's shareholders lost millions, not all shareholders suffered such devastating losses, and in fact, one shareholder benefited immensely from ViewRay's artificially inflated share price: Defendant Dempsey.  Armed with nonpublic material information, including that ViewRay's Backlog was artificially inflated and that the Company could not convert its Backlog into revenue, Defendant Dempsey dumped hundreds of

thousands of personal Company stock in just over two months, from July 1, 2019 to September 3, 2019, for proceeds of *$1,377038.30*.  Defendant Dempsey's insider sales are as follows:

| Date | Price | Quantity | Proceeds |
|------|-------|----------|----------|
| 7/1/2019 | $8.6367 | 16,469 | $142,237.81 |
| 7/1/2019 | $8.6340 | 5,146 | $44,430.56 |
| 8/1/2019 | $8.9756 | 5,146 | $46,188.44 |
| 8/1/2019 | $8.9739 | 16,469 | $147,791.16 |
| 9/3/2019 | $3.5660 | 63,257 | $225,574.46 |
| 9/3/2019 | $3.55660 | 51,460 | $183,506.36 |
| 9/3/2019 | $3.5660 | 164,697 | $587,309.50 |
| | **Total** | **322,644** | **$1,377,038.30** |

## VI.  DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.  Fiduciary Duties

90.  By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed, and owe, ViewRay and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage ViewRay in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of ViewRay and not in furtherance of their personal interest or benefit.

91.  To discharge their duties, the officers and directors of ViewRay were, and are, required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of ViewRay were, and are, required to, among other things:

> (a)  establish and monitor a system of effective and sound internal controls, including those concerning the financial reporting process;

- 29 -

(b)     monitor, review, approve, and ensure the accuracy ViewRay's financial reports and SEC filings;

(c)     monitor and approve revenue, expense, income, accrual, and Backlog determinations, including adjustments thereto, implemented in the financial reporting process;

(d)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)     remain informed as to how ViewRay conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**B.      Additional Duties of the Board**

92.     Pursuant to ViewRay's Corporate Governance Guidelines ("Governance Guidelines"), every member of the Board is responsible for:

(a)     overseeing the conduct of the Company's business to evaluate whether the business is being properly managed;

(b)     reviewing and, where appropriate, approving the Company's major financial objectives, plans, and actions;

(c)     reviewing and, where appropriate, approving major changes in, and determinations of other major issues respecting, the appropriate auditing and accounting principles and practices to be used in the preparation of the Company's financial statements;

(d)     reviewing and, where appropriate, approving major changes in, and determinations under, these Guidelines, the Company's Code of Business Conduct and Ethics and other Company policies;

(e)     reviewing the performance of the CEO and other members of management based on reports from the Compensation Committee; and

(f)     ensuring that the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations.

93.     Furthermore, the Governance Guidelines explain that "the Board and the Board committees shall have an active role in overseeing management of the Company's risks.  The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each."

**C.     Audit Committee's Duties**

94.     According to its Charter, the Audit Committee's purpose is "to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

95.     Specifically, under the Audit Committee's Charter, the Audit Committee Defendants had the following additional duties:

(a)     With respect to the "Annual Financial Statements and Annual Audit":

      i.      The Committee must discuss with the independent auditor any audit problems or difficulties and management's response;

      ii.     The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; and

      iii.    The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

(b)     With respect to the "Quarterly Financial Statements":

      i.      The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(c)     Other Audit Committee Duties:

      i.      The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

      ii.     The Committee must discuss the Company's policies with respect to risk assessment and risk management;

      iii.    The Committee must establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters; and

      iv.    The Committee must report regularly to the Board regarding the activities of the Committee.

**D.    Duties Pursuant to the Company's Code of Conduct and Ethics**

96.    Furthermore, the Individual Defendants had duties per the Company's Code of Business Conduct and Ethics (the "Code"), and according to the Code, [a]ll of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior."

97.     Pursuant to the Code:

**Trading on Inside Information**

Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip," is illegal. All such non-public information should be considered inside information and should never be used for personal gain. You are required to familiarize yourself and comply with the Company's policy against insider trading, copies of which are distributed to all employees, officers and directors and are available from the [CFO]. You should contact the [CFO] with any questions about your ability to buy or sell securities.

\*      \*      \*

**Quality of Public Disclosures**

The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the [SEC] and our other public communications shall include full, fair, accurate, timely and understandable disclosure and the Company has established a Disclosure Committee to assist in monitoring such disclosures.

**E.      Breach of Duties**

98.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of ViewRay, the absence of good faith on their part, and/or a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

99.     In particular, the Individual Defendants breached their duty of loyalty and good faith and violated the law by: (i) causing ViewRay to issue materially false and misleading reports with the SEC, which contained a falsified and inflated Backlog, among other things; (ii) failing to implement meaningful internal controls over ViewRay's financial reporting process; and (iii) allowing Defendant Dempsey to sell hundreds of thousands of personally-held Company stock while in possession of nonpublic material information.

## VII.    DAMAGES TO VIEWRAY

100.    As a result of the Individual Defendants' gross misconduct, ViewRay was forced to disseminate false and misleading public statements containing falsified and inflated Backlog metrics throughout the Relevant Period.  The Individual Defendants' misconduct has devastated, and continues to devastate, ViewRay's credibility, as reflected by the Company's loss of over *$570 billion* in market capitalization.

101.    The Individual Defendants' misconduct has also gravely damaged, and continues to cause damage to, ViewRay's reputation within the business community and in the capital markets.  In addition to share price, ViewRay's current and potential investors generally consider a company's ability to accurately and legally report its financials to be of the utmost importance. However, now, investors and lenders are less likely to provide ViewRay with needed capital to finance its future business endeavors, and provided these investors or lenders do so, ViewRay's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because of the improper statements and false financial metrics disseminated by the Individual Defendants, which have materially increased the perceived risks of investing in, and lending money to, the Company.

102.    Further, as a direct and proximate result of the Individual Defendants' actions, ViewRay has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

> (a)    costs incurred from litigating, defending, and resolving the Securities Action alleging violations of federal securities laws;
>
> (b)    the Company's devastating loss in market capitalization; and

(c)     costs incurred from wrongful compensation and other benefits paid to the

Individual Defendants who breached their duties to ViewRay.

## VIII.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.    Plaintiff brings this action derivatively in the right and for the benefit of ViewRay to redress injuries suffered, and to be suffered, by ViewRay as a direct result of the Individual Defendants' breaches of fiduciary duties, violations of the federal securities laws, unjust enrichment, and waste of corporate assets.  ViewRay is named as a nominal defendant solely in a derivative capacity.

104.    Plaintiff will adequately and fairly represent the interests of ViewRay in enforcing and prosecuting its rights.

105.    Plaintiff was a shareholder of ViewRay common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

106.    Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

107.    At the time of filing this action, the Board is comprised of the following nine (9) directors: Drake, Castelein, Huennekens, Grossman, Moore, Roberts, Wilensky, Xie, and non-party B. Kristine Johnson.  At a minimum, a majority of these directors are not disinterested and independent with respect to the acts and omissions alleged herein.  Notably, at least half of the current board faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.  Where a plaintiff alleges that at least half of the members of the current board are not independent or disinterested, demand is excused as futile.

A.    **Demand Is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

108.    The Director Defendants face a substantial likelihood of liability for their individual misconduct, as detailed herein.  The Director Defendants were directors throughout the Relevant Period, and as such, had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

109.    Indeed, Director Defendants Drake, Moore, Castelein, Grossman, Roberts, and Huennekens signed the false and misleading 2018 10-K.  As mentioned above, the 2018 10-K was false and misleading because it misrepresented and/or failed to disclose that, *inter alia*: (i) the Company's reported Backlog was overstated due to the inclusion of orders with insufficient surety as to permit for their inclusion in reported Backlog; (ii) the Company included invalid orders in Backlog, which were not valid transactions by ViewRay's own stated criteria and did not have a contract with an end-user customer; and (iii) the Company's internal controls were not, in fact, effective.

110.    As a result, the Director Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, rendering demand upon them futile.

111.    Moreover, the Director Defendants as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of

materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

112.    The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to the Company's wayward fiduciaries who proceeded to breach their fiduciary duties to the Company were improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

113.    The Director Defendants' making or authorization of false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of ViewRay to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

114.    In addition, as alleged above, Defendants Drake, Roberts, Moore, Grossman, Castelein, and Huennekens violated Section 14(a) of the Exchange Act by negligently making or causing to be made the misstatements and omissions in the Proxy Statement.

**B.      Demand Is Futile as to the Audit Committee Defendants**

115.    The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing ViewRay's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects, including those related ViewRay's Backlog, were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants, therefore, is futile.

116.    Defendants Huennekens, Moore, Grossman, and Roberts each served on the Audit Committee at some time during the Relevant Period.  Therefore, these Individual Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith due to their failure to meet their obligations as members of the Audit Committee.  Since each of these Board members is therefore not independent or disinterested, demand is excused as futile.

**C.      Demand Is Futile as to Defendants Drake for Additional Reasons**

117.    Demand is also futile as to Defendants Drake because, as the Company admits, via the Proxy Statement, he does not meet the standards for director independence under NASDAQ listing standards.

118.     Defendant Drake is currently employed at ViewRay as CEO and President, and as such, derives a substantial portion of his income from employment with ViewRay.  Drake received $22,370,376 in total compensation from ViewRay in 2018, which does not include the lucrative stock options and performance-based restricted stock units that were granted to Drake as part of his employment compensation package.  Because Drake has financially benefitted from the wrongdoing of the Individual Defendants, and because his livelihood continues to depend on his ongoing employment with ViewRay, he is not independent and not disinterested.  Demand is therefore futile as to Drake.

119.     Plaintiff has not made any demand on shareholders of ViewRay to institute this action since such demand would be a futile and useless act for the following additional reasons:

(a)      ViewRay is a publicly traded company with over 147 million shares and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of ViewRay shareholders; and

(c)      making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, even assuming all shareholders could be individually identified with any degree of certainty.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

120.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claim.

122.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, **in contravention of such rules and regulations as the [SEC] may prescribe** as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

123.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

124.    The Company's Proxy Statement violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that: (i) that the Company's reported Backlog was overstated due to the inclusion of orders with insufficient surety as to permit for their inclusion in reported Backlog; (ii) the Company included invalid orders in Backlog, which were not valid transactions by ViewRay's own stated criteria and did not have a contract with an end-user customer; (iii) the

Company's internal controls were not, in fact, effective; and (iv) as a result of the foregoing, ViewRay's public statements were materially false and misleading at all relevant times.

125.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the Proxy Statement were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditor.

126.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxy Statement.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTIES

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As alleged in detail herein, each of the Individual Defendants had a duty to ensure that ViewRay disseminated accurate, truthful, and complete information to its shareholders.

129.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were complete and accurate and did not contain any material misstatements or omissions.

130.    The Individual Defendants violated their fiduciary duties of loyalty, and good faith by causing or allowing the Company to disseminate to ViewRay shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements

and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

131.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

132.    Plaintiff, on behalf of ViewRay, has no adequate remedy at law.

**COUNT III**

**AGAINST THE INDIVIDUAL DEFENDANTS
FOR UNJUST ENRICHMENT**

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ViewRay.

135.    Plaintiff, as a shareholder and representative of ViewRay, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

136.    Plaintiff, on behalf of ViewRay, has no adequate remedy at law.

**COUNT IV**

**AGAINST THE INDIVIDUAL DEFENDANTS
FOR WASTE OF CORPORATE ASSETS**

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in connection with the Securities Action resulting from the Individual Defendants' misconduct.

139.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

140.    Plaintiff, on behalf of ViewRay, has no adequate remedy at law.

### IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing ViewRay to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, including, but not limited to:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of ViewRay's directors, executives, and other employees;

- a proposal to strengthen ViewRay's insider trading policy;

- a proposal to permit the shareholders of ViewRay to nominate at least three (3) candidates for election to the Board to replace the culpable Individual Defendants currently still sitting on ViewRay's Board;

- a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting be elected on an annual basis;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C.    Awarding to ViewRay restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## X.    JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 21, 2020

**MURRAY MURPHY MOUL + BASIL, LLP**

*/s/ Joseph F. Murray*
Joseph F. Murray (OH 0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: (614) 488-0400
Facsimile: (614) 488-0401
Murray@mmmb.com

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Counsel for Plaintiff*

DocuSign Envelope ID: B0A31657-48D0-4AFF-B8D4-17A4E4DE229

## **VERIFICATION**

I, Ray Gile, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: _____7/16/2020_____        _____
                                       Ray Gile